Green, J.
delivered the opinion of the court.
The prisoner was indicted in the Circuit Court of Henderson county, for the murder of William Willis, on the 5th of February,i 1848. On the trial it appeared that on the day the homicide was committed, a number of persons had collected at the village of Independence, in said county, among whom were the prisoner and the deceased. Some time after twelve o’clock of the day, the deceased and William H. Spain, (who is cousin to the prisoner) were engaged in a quarrel, and during the time they were thus engaged, the prisoner was seen by the witness Turner, to go into the grocery, and take a steel-yard pea off the counter, and put it in his pocket. He then went out mingling in the crowd, near where the angry parties were standing. After some time the deceased, and the witness Spain ceased their quarrel and separated. After this separation the defendant went to Spain and solicited him to bring on the quarrel with Willis again, and to get into a difficulty, at the same time showing the witness a stick and some rocks, which he said he would use. The ant told the witness Hemphill, that Spain and WA quarreled, and come near fighting, and that if a fgffi had taken place, he would have made a hand — that, got a steel-yard pea, but had put that away, and a rock.
The defendant said to witness Cook, that if Willis' up any shines” he would do him some great bodily harm. After the first quarrel between Spain and Willis had subsided, the defendant, two or three times during the evening, *648 solicited Spain to bring on a difficulty with Willis, and that he would take it off the witness’s hands.
About dark, Spain and Willis again quarreled, Spain having his coat off to fight, and Willis told him if he pressed on him, he would cut him. At this time the parties were separated again. Soon after this quarrel the defendant showed Spain some rocks, larger than a man’s fist, and the defendant talked about beating Willis with these rocks. Soon after this quarrel was over, the defendant in passing the witness Pope, slipped a rock in the hand of the witness.
While Spain and Willis were engaged in the last mentioned quarrel, the witness Roberts saw the defendant with a brickbat and a stick, and heard him say, (speaking of Willis) •* God d — n him, I will fix him before he leaves here.”
The witness McClure, just before sunset, heard the defendant request another person, whom witness did not know, to raise a difficulty with Willis, saying, “ he (Riley) would give him hell.” The defendant then had a stick and a brickbat in his hands.
About sunset, while Willis and witness Robinson were in conversation, the defendant came up, with a stick and brickbat in his hand and spoke to Willis as if he wished to raise a difficulty; and Willis told the defendant “ to go away or he would cut his guts out, that he had been following him all day.” After dark the witness, Meales, saw the defendant and W. H. Spain go up near where Willis and another man were talking, and witness heard the defendant say to Spain, “let him alone, I will fix him directly.” About an hour, or an hour and-a-half in the night, a number of persons having got their horses to go home, it was agreed to have some spirituous liquors before *649 they went, and for this purpose, they were at the grocery door, the light shining out at the door. While waiting for the liquor, Willis walked up in a few feet of the grocery, when Roberts invited him to go home with him, to which Willis replied he had concluded to stay’with Jo. White. Just at this time Willis was knocked down. The lick made such a noise, that Roberts said, “ Willis is shot,” and the general impression was that he was shot. None of the persons present saw who inflicted the blow, or with what instrument it was done. Willis was carried into the grocery, and it was found that the blow was struck near the top of the back part of the head, breaking the scull badly, and making a wound in the shape of the letter V.
The stroke ■ was given in Henderson county, and the wounded man was taken to the house of the keeper of the grocery, where he remained until next morning; and in four or five days he died of the wound.
After the blow was struck, and the wounded man had been taken into the grocery, the defendant, who had not been before seen recently, came in, and W. H. Spain (his cousin who had quarreled with Willis) told him, it was said some person had killed Willis. The defendant said “ he reckoned not, that he had knocked him downand he then showed the witness a piece of timber with which he said he did it. It was a three cornered piece of timber about four or five feet long, and as large as a stake or small fence rail, and the defendant said he struck him overhanded with it. The witness told the defendant to hush! — but he afterwards said again that he had knocked Willis down with the piece of timber.
After the deceased was knocked down, the defendant' told the witness, Darnell, that he had “ tapped him over.” *650 Witness told Mm, he did not wish to hear any thing about it. The defendant asked the witness if he was a friend to Willis. Witness replied that Willis had never done him any harm. After the blow was stricken, the defendant went to the house of McKinney, at Independence, whose wife is his kinswoman, and while there, allusion being made to Willis having been knocked down, the prisoner said “ d — n him he ought to die, and he ought to have been knocked in the head long ago.” He then requested Jesse Taylor (a young man who was at McKinney’s) to go to town for McKinney, and tell him to come down. He said that some body might be suspected about Willis, and that he wanted to get a horse from McKinney, that his own horse was blind, and that he wanted to go to Thomas Spain’s that night. When the witness started after McKinney, the defendant followed him out at the door, and told the witness to tell McKinney that his wife wanted him. He also told the witness, if any one enquired, to tell them that he (the defendant) was not there, and that Mrs. McKinney had no such relation.
William Manly, a witness, proved that he and the defendant were playing cards in a little house near the grocery, about two o’clock on the day Willis was struck, and that they heard some one out of doors talking and going on as if in a considerable glee, and the defendant asked if that was not Buck Willis. Witness told him it was, and the defendant then said “ if he does not mind I will lay him in his tomb before night.” lie then laid the cards down, and went out, and the witness saw him afterwards with a brick and stick.
On cross examination this witness stated that he had not mentioned these facts to any one until the November term of the court; that he was in the court-house at March, July and November terms of the court, when Riley was *651 brought out for trial, and that after he was brought out at November term, he told Edward Willis of the conversation; that he lived four or five miles from Willis, and was friendly with the family.
Many witnesses state that the prisoner was drinking during the day of the homicide, but that he was not drunk.
The court charged the jury, among other things not excepted to, in substance, that to constitute lying in wait, three things must concur, to-wit, waiting, watching, and secrecy; and that these facts must be established beyond a reasonable doubt, to authorize the conclusion that there was such lying in wait. “ That if they.should be of opinion there was such lying in wait, and that the fatal blow was given by the prisoner so lying in wait, for the purpose of inflicting some great bodily harm upon the deceased, (though short of the intention of taking life, but which would be murder at common law,) it would be murder in the first degree.” The court further stated to the jury, “ that if any stick or other weapon is used by one lying in wait for the purpose, calculated to produce . great bodily harm, and if used in such manner great bodily harm is the probable consequence, and that death ensue, so that it would be murder at common law, it is murder in the first degree.”
The jury returned a verdict against the prisoner of murder in the first degree.
The prisoner moved for a new trial, and offered the affidavits of 0. H. Williams and L. M. Jones, in which the affiant C. H. Williams states, that he saw Phillip Jewell in conversation with William Leonard, one of the jurors ip this cause, and that he saw some one, whose name he did not know, in conversation with John Halbrook, another of the jurors, after the jury was chosen. The *652 conversation was during the evening that the jury was empanneled.
The affiant L. M. Jones, states that he saw some one in conversation with one of the jury, as is stated by C. H. Williams; that he did not know the name of either of the parties, and that he called the attention of Cl H. Williams to the same.
The prisoner also offered the affidavit of Dan’l McCulIom, who stated that he was the constable that had charge of the grand jury, when the bill of indictment was found against the prisoner, and that he heard the testimony of W. H. Spain, and that he did not make any statement that conveyed. the idea, that the defendant had struck the deceased with a stick, but left the impression that the blow was inflicted by a brickbat or rock. The prisoner also offered his own affidavit, in which he states that he did not express satisfaction at McKinney’s, that Willis had been knocked down, as stated by Jesse Taylor, and that he can disprove said statement by Mrs. McKinney; that he was taken by surprise, by the evidence of said Taylor; that Mrs. McKinney had been summoned, but it was for the purpose of rebutting another statement of Taylor, which he ascertained he could explain by another witness, and his counsel advised him that Mrs. McKinney’s evidence was unnecessary. The affiant was taken by surprise by the evidence of William Manly. ■ He made no such threat's as those stated by Manly, and he feels sure he can procure evidence to prove, that he and Manly were not in the house near the grocery playing cards.
The Attorney General then introduced the affidavit of John Halbrooks, a juror, who stated, that while sitting on the jury bench, before he was sworn, finding himself detained unexpectedly on the jury, and having in his *653 pocket a hammer which he had used on his way to town to put up signs on mile-posts, he beckoned Richard Goodman to him, and handed him a hammer, and told him to tjake it and affiant’s horse home with him, to which Goodman replied, he would. Goodman was the only man to whom affiant spoke, and this was all that passed between them. This was in the presence of the court.
The Attorney General also introduced the affidavit of Richard Goodman, which corroborates the statement of Halbrooks in every particular.
The Attorney General also read the affidavit of Phillip H. Jewell, who states that the only remarks between him and William Leonard, one of the jurors, were as follows: while the jury was being selected, he saw said Leonard setting on the jury bench, and not thinking at the moment he had been selected on the jury, affiant said to him, “ the little note! have on you in favor of Collins, I will leave with Henry.” Leonard replied, “ very wellas affiant walked off, Leonard said “what about staying it?” Affiant replied “ I will stay it myself.” Affiant was deputy sheriff and had the note for collection. This was all the conversation affiant had with Leonard after he was selected as a juror. The affidavit of Wm. Leonard corroborates, in every particular, the statement of Jewell.
The Attorney General also introduced' the affidavit of Jesse Taylor, who states, that his evidence before the committing justice, was the same as that given on the trial of this cause, before the jury, and that the defendant was present, and heard said evidence.
The court overruled the motion for a new trial, and pronounced judgment of death upon the prisoner; from which judgment he appeals in error to this court. Several *654 errors are assigned, and it is insisted'that the judgment should be reversed.
1. It is said, that although the conversation between the juror Leonard, and the deputy sheriff Jewell, is sufficiently explained, such is .not the case, in relation to the conversation in which the juror Halbrooks was engaged; that the affiants, Williams and Jones, did not know the person with whom Halbrooks was seen conversing, and, therefore, we do not know that the conversation explained by the affidavits of Goodman and Halbrooks, was the same conversation mentioned in the affidavits of Williams and Jones. This objection to the explanation of that conversation, is untenable, Halbrooks swears he spoke to no one except Goodman, and as he was seen to converse only one time, the conclusion is irresistible, that the conversation mentioned by Williams and Jones, is the one explained by the affidavits of Halbrooks and Goodman. And we think the explanation of the conversation of both the jurors, Leonard and Halbrooks, establishes that it was impossible for the defendant’s case to have been prejudiced thereby. The conversations were in the presence of the court, and consisted of a very few words, upon matters of necessary business, which had no relation whatever to the prisoner’s case. And" although it was improper, and should have been punished by the court, yet we do not think it was of such a character, as to affect the verdict. A separation of the jury, or a conversation unexplained, we have held a good cause for a new trial, because in such case, we cannot know that the juror thus separating himself, or hus conversing, was not tampered with. But on the other hand, it is the settled law of this court, that such separation, or conversation, may be explained; and although the *655 juror may and ought to be punished, yet when it is satisfactorily shown, that he was not tampered with, and that no influence unfavorable to the prisoner, could by possibility have existed; it is no cause for a new trial.
2. No sufficient ground for a new trial is laid in the affidavits of Daniel McCullom and the prisoner.
McCullom’s affidavit only goes to impeach the testimony of William H. Spain. Spain stated before the jury that the defendant told him, that he had knocked the deceased down with a stick of timber. McCullom says Spain made no such statement before the grand jury, but, on the contrary, left the impression that the blow was given with a brick or rock.
This witness Spain is thé cousin of the prisoner — is the man who had quarreled with the deceased the day he received his mortal blow — whose quarrel the defendant espoused, and sought to excite and aggravate, and to whom the defendant’s communication were made in the confidence of his secrecy and fidelity to him. If such a witness was less full and explicit in his statements before the grand jury, than he was compelled, by a searching examination on the trial, of the cause tobe, it is not at ail wonderful. Such discrepancy, in, the evidence of a reluctant witness’s statements, is not calculated to affect his credit. Besides the defendant could have examined McCullom to this point on the trial, had he chosen. He does not state in his affidavit, that he was surprised by any thing Spain testified on the trial; nor does he pretend that he could not have had the benefit of McCullom’s evidence.
3. The statement in the defendant’s affidavit, that he was surprised by the evidence of Jesse Taylor, is iully rebutted and disproved by Taylor’s affidavit. If Taylor *656 made the same statements before the committing magistrate, in the presence of the prisoner, that he had made on the trial, it is impossible that the defendant could be surprised thereby; and this Taylor swears he did.
4. The defendant swears that he was surprised by the proof of his. threats made to Manly, while they were playing cards, and that such threats as the ones proved by Manly, were never made by him, and he feels certain that he can procure testimony to show, that he and said Manly were at no time during the evening of the day on which Willis received his wound in the town of Independence, together alone in any grocery playing cards.
This affidavit, to be sure, denies the truth of Manly’s evidence, and states that the prisoner was surprised thereby; but he does not show that he can prove the statement false, nor does he produce the affidavit of any witness contradicting the statement of Manly. This it would be incumbent on him to do, in order to lay a ground for a new trial. If the unsupported affidavit of a prisoner, that the evidence of a material witness was false, that he was surprised thereby, and that he felt certain he could prove it false upon another trial, were held sufficient to obtain a new trial, it is manifest no verdict against a criminal could stand. There is no defendant, in the circumstances of this prisoner, who would scruple to make the necessary affidavit.
5. It is insisted that there is no evidence in this record, that the deceased man died in Henderson county; and that it is indispensable in order to give the court, trying the prisoner, jurisdiction of the cause, to show that the death took place in the county where the indictment was found.
*657 At common law, tbe party committing a criminal offence must be indicted in tbé county where' the offence was committed. But in the case of homicide, if the wound was given, in one county and the death happened in another, it was said by some that the party was not indictable at all, because the offence was not complete in either county, and the jury could enquire of what happened only in their own county. 1 Hawk, P. C. 94, 1 East 361. But the common opinion was that he might b.e indicted where the stroke was given, for that alone is the act of the party, and the death is but a consequence; 1 East 361. The doubt then raised upon this subject, produced the statute, 2 and 3 Edw. 6 ch. 24, which provided that in such case, tire party might be tried in the county where the death happened. This statute the Supreme Court of North Carolina, decided in Orrell's case, (1 Dev. L. R.) was in force in that State, and therefore until the passage of our act .of 1809, ch. 126, sec. 1, a party guilty of homicide, was indictable in the county where the death happened. But that act provides that “in all criminal cases the trial shall be had in the county in which the offence may have been committed, * * * subject to a change of venue according to the provisions of the law.” It is insisted by the counsel for the prisoner, that the act of 1809, does not repeal the statute, 2 and 3 Ed. 6, but is only declaratory of the law as enacted by that statute. We think this construction erroneous. For although at common law, it was said the offence was not complete until the death, yet it would be doing violence to language to say, that the offence was committed in the county where the death happened, although the stroke were given in another county. Therefore, when the act of 1809 prescribes, that the trial shall be had *658 in the county where the offence was committed, the intention of the Legislature was, not to declare the law as enacted in 2 and 3 Ed. 6 ch. -24, but to alter the law, and establish a different rule. But it is insisted, that this construction, only restores the common law rule, and involves the subject before us in all the uncertainty that existed before the statute of Ed. 6; and as a consequence, if the stroke be given in one county and the death happen in another, the party can be indicted in neither. We do not think these consequences follow. In the first place the statute of Ed. 6, was enacted to remove all doubt upon the subject, because different opinions, growing out of the refinements of that' period of the common law, had been expressed. We find no decision in which it had been held that the murderer,, in such case, could be indicted in neither county. On the contrary, East says, the common opinion was, that he might be indicted where the stroke was given. That alone, is the act of the party. He commits this act, and the death is only a consequence. Therefore, when the Legislature enact that the party shall be tried in the county where the offence may have been committed, - they intended where the active agency of the perpetrator was employed. And this law is only in accordance with the constitution, which declares that he shall have “ a speedy public trial, by an impartial jury of the county or district in which the crime shall have been committed.” Art. 1, sec. 9. These provisions of the constitution, and of the act of 1809, were intended to secure the right of trial with certainty, in the neighborhood of the witnesses, so that they might be easily procured, and thus secure the defendant a fair trial. We think, therefore, that this trial was properly had in the county of Henderson, where the fatal *659 stroke was given. The indictment alleges that the blow, and also the death, occured in Henderson county. The proof is, that the stroke was given on the night of the 5th of February, at Independence, in Henderson county, and that the deceased was taken to the house of Jo. White, where he remained until morning, and that he died on the 9th of the month. There is no positive proof of the place of his death; but it is not proved that he was removed from the house of White; and from the nature of the wound, and the short time he survived, it may well be inferred that he died in Henderson county. More especially may this be done in a case where the proof is clear that the stroke was given in that county, which, thereby, became the county having jurisdiction of the offence.
6. It is next insisted, that his Honor the Circuit Judge erred in his charge to the jury;
We have only a single paragraph of the instruction which was given to the jury, presented to us in this record. The bill of exceptions states, that the charge of his Honor, was excepted to in the part only here certified. The exception here taken, is to the construction the court put upon the second and third sections of the act of 1829, ch. 23, commonly called the Penitentiary Act. The second section defines murder to be, “the killing a reasonable creature in being, and under the peace of the State, with malice aforethought, either express or implied.” The third section provides that “ all murder that shall be perpetrated by means of poison, lying in wait, or by any other kind of wilful, deliberate, malicious and premeditated killing, or which shall be committed in the perpetration of, or attempt to perpetrate any rape, robbery, burglary, or larceny, shall be deemed murder in the first *660 degree; and all other kinds of murder, shall be deemed murder in the second degree.”
It is insisted for the prisoner, that although the fact of murder “ by poison or lying in wait,” shall be established, ■ it will not he murder in the first degree under the statute, unless it also be made to appear, that the act was done wilfully, deliberately, maliciously and pre-meditatedly; that the words “by means of poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing,” are to be construed as though the Legislature had said, “If any person shall, by lying in wait, wilfully, deliberately, maliciously, and premeditatedly kill another, it shall be murder in the first degree. The argument is, that the State must establish the wilful, deliberate, malicious and premeditated character of the act, independent of, and as though the lying in wait did not exist in the case. This, we think, would be an erroneous construction of the act. For if the construction contended for were correct, the lying in wait would contribute nothing towards the establishment of the guilt oí the party, except as a fact going to show the wilful and deliberate nature of the act; but it would be a fact which might be weakened, and its influence done away by other evidence. Such is not the meaning of the statute. The sum of the statute is this: In cases of murder by ordinary means, the circumstances of the transaction must show, that it was done wilfully, deliberately, maliciously and premeditatedly, or it is not murder in the first degree; but if murder be perpetrated by poison, or lying in wait, it shall be murder in the first degree. The fact of lying in wait, shall of itself, be evidence of a wilful, deliberate malicious and premeditated purpose. If it be proved that the killing was of such character, *661 that under ordinary circumstances it would have been murder at common law, and the fact of lying in' wait exist, that fact will make it a case of murder in the first degree, under the statute. Where a lying in wait is established, all proof as to “ intention” or “ wilfulness” is irrelevant, if the stroke be given under circumstances that would make it murder at common law. If a party strike with a deadly weapon, without provocation, intending to inflict' the stroke, as a matter of law, which he cannot dispute, he shall be .held to intend the consequences ; and if death ensue, it is murder. And in- such cases, if a lying in wait exist, it is murder in the first degree. We think therefore, His Honor has given, in his charge to the jury, substantially a correct construction of this statute.
7. Finally, it is insisted, there is no evidence of lying in wait, in this case; or of other wilful, deliberate, malicious and premeditated killing, and therefore it is only murder in the second degree.
We are of opinion the jury were well warranted, by the evidence in the cause, in coming to the conclusion announced in their verdict.
Without recapitulating the evidence already set out in this opinion, it is sufficient to say, that the proof shows a constant state of malignant feeling on the part of the prisoner, towards the deceased, dui’ing the entire afternoon, and evening of the day of the murder. The quarrel between Spain and Willis, occurred between twelve and two o’clock. Not to mention the statement of Manly, as to the threat then uttered at the card-table; the concurring testimony of many witnesses proves, that this quarrel awakened in the prisoner the most hostile feelings towards the deceased. He immediately armed himself with the *662 steelyard pea, a most deadly instrument; . and with this weapon he went near the angry man, intending, as he said afterward, to use it against Willis, if a fight had ensued. But the parties did not fight, and he was then disappointed of the opportunity to fulfil his cherished purpose. Soon, however, he stimulates his cousin to renew the quarrel, and bring on a difficulty. This he did several times in the day, promising to take it off his hands, and showing him a stick and rocks, with which he was armed, and with which he said he intended to beat the deceased. About dark, he succeeded in bringing the parties to renew the quarrel; and while they were thus engaged, he was near, armed wi$i a stick and rocks, and as he walked around the crowd he slipped a rock into the hand of Pope. No fight occured at this time, the parties being separated by others. After this quarrel had subsided, he told his cousin “to let him alone, that he would fix him directly.” From this time, which was soon after dark, we hear nothing of the prisoner, until the fatal blow was struck. And this was done when all was quiet, when there were no angry words between any of the -parties, when the deceased and the balance of the company were about to sepai’ate for the night: in the darkness and unseen by any one, the prisoner came behind the deceased, and with a piece of timber four or five feet long, and as large as a stake or small fence-rail, with both hands, he struck the deceased a blow on the top of the head, shivering the scull and causing death. Any commentary to show that this is a case of wilful, deliberate, malicious and premeditated killing, would be wholly superfluous. Such clear and unquestionable evidence, of a deliberate purpose to kill, rarely exists. We think, also, that the jury might *663 have been warranted in finding, that there was a lying in wait. • But this was not necessary in order to justify their verdict.
Upon the whole we see no error in the record, and affirm the judgment.